### In re NATURALIZATION OF SUBJECTS OF GERMANY.

#### (District Court, E. D. Wisconsin.   May 14, 1917.)

ALIENS ⟜61—ENEMIES—NATURALIZATION—"APPLICATION."

    Rev. St. § 2171 (Comp. St. 1916, § 4362), first enacted in 1802 (Act April 14, 1802, c. 28, 2 Stat. 153), declares that no alien who is a native, citizen, or subject, or a denizen, of any country with which the United States is at war at the time of his application, shall then be admitted to become a citizen of the United States. In 1906 (Act June 29, 1906, c. 3592, 34 Stat. 596) the naturalization law was changed, and aliens were for the first time required to file a petition for citizenship, giving a 90-day notice before the certificate could be granted. Prior to this time applications had been granted without such notice. During the interim between the filing of a petition for citizenship and the hearing on such petition a state of war was declared between the United States and the German Empire, of which the petitioners were subjects. *Held* that, as the change in the naturalization law was for the protection of the United States, and as the obvious purpose of section 2171 was for the protection of the United States, such section must be construed as inhibiting the granting of citizenship to the petitioners, on the theory that the formal application in court is the one referred to.

    [Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 119–122.

    For other definitions, see Words and Phrases, First and Second Series, Application.]

In the matter of certain petitions for naturalization filed by subjects of Germany.   Petitions denied.

William T. Birkby, Naturalization Examiner, of Chicago, Ill., for the United States.

GEIGER, District Judge. At the last hearing of naturalization matters, there were presented four petitions by persons who were sub-

jects of Germany. These had been filed, and notice of their pend-·
ency given, in the regular manner. The proofs upon each were taken,
and it is conceded in each case that the applicant, though a subject
of Germany, is qualified to become an American citizen. No bar is
interposed to admission, save such as arises—if any does arise—by
virtue of a statute of the United States, viz.:

"Sec. 2171. No alien who is a native citizen or subject, or a denizen of any
country, state, or sovereignty with which the United States are at·war, at the
time of his application, shall be then admitted to become a citizen of the
United States." Comp. St. 1916, § 4362.

So much of the statute is material for present consideration. It
contains certain other provisos, to which allusion will be made. On
its face this statute appears quite plain. It so happens that on the 6th
day of April, 1917, the Congress of the United States passed a resolu-
tion declaring that a state of war exists between the United States
and the Imperial Government of Germany, and hence, when these cases
were called, the examiner, upon the authority of this statute, objected
to the issuanec of a certificate of naturalization to the four applicants
to whom I have referred.

The question arises: What is meant by the language "with which
the United States are at war," etc.? On the one hand, it may be
urged that "at the time of his application" refers to the time of filing
the formal written petition with the clerk of the court, and whereof
90 days' notice must be given before the actual naturalization can take
place. On the other hand, it may be urged that the word "application"
means what it meant when the law was passed, 115 years ago. At this
time the formality respecting the proceeding for naturalization con-
sisted in a declaration of intention, as under the present law, and the
subsequent coming into court of the applicant with his witnesses, and
in open court asking that his proofs be received, and, if found suffi-
cient, the oath be administered and the certificate of naturalization
granted; in other words, that he be adjudged admitted to citizenship.
So we have this situation: That when this law was passed, in 1802, the
term "application," as then used, referred to that manner of pro-
ceeding. That law remained in force, and now remains in force; but,
104 years later, the present naturalization law, providing for the pres-
ent routine of proceedings, was passed, and for the first time intro-
duced the requirement of the filing by the applicant for citizenship of
what is denominated in the law a "petition," which, being filed by the
clerk is entered of record as a proceeding by the applicant to procure
naturalization. A 90 days' notice is given, with the further limitation
upon the court that no one shall be naturalized unless that petition
shall be heard in open court by and in the presence of the judge, upon
the testimony of the applicant and his witnesses.

Four weeks ago, after a very brief opportunity for investigation, I
expressed the informal opinion that the statute means the same thing
to-day, has the same meaning to-day, as it had at the time it was passed;
and, with the investigation that I have been able to give the matter
in the meantime, my then expressed informal view has not only not
been shaken, but has been fortified, so that to-day I am ready to say

that I am entirely clear as to the meaning of the statute, and as to the course which the court must pursue in respect of these four applicants, and any other application that may come before it for hearing during the time of the present hostility between this country and Germany.

The statute, obviously, at the time of its passage, could have but one meaning. If the application at that time referred to the act of coming into open court, presenting the proofs which, if found sufficient, entitled the administration of the oath and the issuance of a certificate, it could mean nothing else but this, and its purpose was to declare in plain language: That when this country is at war with another country, no subject of that country shall then be naturalized. That language of the act remains the same to-day, and if this section 2171 had first appeared in 1906, when the present law was passed, we could all agree that its terms might be broad enough to apply to either situation. That is to say, that the language "application" might refer to the petition that had been filed, and might refer to actual appearance for naturalization in court; but if we are to give effect to the statute as it reads to-day, its language plainly bars the naturalization of subjects of an enemy country in either event, because it reads:

"No alien who is a native," etc., "of any state or sovereignty with which the United States are at war *at the time* of his application shall *be then* admitted to become a citizen of the United States."

Obviously, if any effect is to be given to the word "then," if that word is not to be eliminated from the statute, the same meaning of the statute must be ascribed to it to-day that was plainly disclosed at the time of its original passage; because, if construed to refer to the *time of filing* the petition, it would be absurd, because he could not under the present statute be *then* admitted in any event. So I have no hesitation in saying that this means to-day what it meant when it was passed in 1802.

Now there are certain considerations that, it seems to me, tend conclusively to support this view. Congress, when passing this law— and it is found in one of the first general naturalization laws that was passed—was dealing, not with matter relating to any particular equity or consideration for particular aliens, but dealing broadly with the relation of this sovereignty toward those domiciled here who were subjects of a country and owed actual legal allegiance to a sovereign with whom this nation may be at war; and the obvious purpose of the statute was to declare and effectuate a public policy with respect to those so circumstanced. There inheres in the statute the same declared policy found in many other situations when once a state of war arises. It is but a further declaration of what is recognized generally, that when hostilities arise between this nation and another nation, the courts of this nation are not, as a matter of right, open to subjects of the other nation who may be domiciled in this country. It is a recognition of what I believe is legally and practically true, that when once hostilities arise between this sovereignty and another sovereignty, the recognition accorded to aliens, subjects of the enemy country, domiciled here, is a matter of executive grace. In other words, when once hostility arises between the two countries, the subjects of the enemy

who may be in this country, take on legally, though perhaps not actually, the attributes of hostility which their sovereign takes on, and they are dealt with upon considerations, as I have just said, of executive grace, and not upon considerations of legal right.

Now, take a practical view of the construction of this statute. There are aliens, subjects of Germany, who have filed petitions prior to the declaration of the existence of hostilities. There are others who are in all respects similarly situated, except that they did not file their petitions on or before the 90 days prior to April 6th. What sound reason or what logic can there be in dealing with the man who had in fact filed his petition, upon entirely different considerations, than are to be put forward in dealing with a man who had not filed his petition? It is my judgment that it cannot be done, unless we concede that the man who had in fact filed his petition had acquired some different or advanced status through the filing of his petition, which the other man had not acquired. I do not believe the one who has done that has acquired any other or different status. He is still an alien, and does not have any legal status as a quasi alien or as a quasi citizen. He becomes a citizen only through his act, in open court, of abjuring, under oath, the old, and assuming the new, sovereign allegiance; and, by way of illustration, I believe that the executive proclamation, issued shortly after the declaration of hostility, on April 6th, includes as a matter of law and in fact all those who had filed their petitions just as certainly as it included all those who had not filed their petitions, and that those who had filed their petitions are subject to executive control, just as much as those who had not filed their petitions. But that they acquired a status through the filing of the petition, involving, legally, anything more than the standing of an alien, cannot be entertained.

By way of further illustration, these aliens, whether they had filed their petitions or not, would be subject to the ordinary disabilities attending alien enemies, as, for instance, the right to resort to courts to prosecute suits—in fact, every disability which settled principles impose upon them because of their legally hostile status. Now, looking at the matter in the light of these considerations, is it sensible to ascribe to Congress in 1906, in so far as it was dealing with matter of procedure and practice, an intention in the slightest degree to recede from the declared policy of the statute of 1802, or that, in so far as it was seeking by a variety of new sections to place greater safeguards about the whole field of naturalization, it should deliberately, through equivocal nonaction, relax at the point where, presumptively, at least, the greatest scrutiny was necessary—the naturalization of those with whose legal sovereign we may be at war?

I am satisfied that nothing short of a clear legislative declaration, expressly amendatory of the section dealing with this matter, should be allowed to bring about a result operating to impair a policy upon so important a matter, plainly embodied in a statute passed over a century ago. The amendatory provisos to this section, passed to meet situations growing out of the war of 1812, serve, in my judgment, to support the view that the policy declared in the original enactment was not only clearly understood and reaffirmed, but that it was intended to impose upon courts a limitation against the exercise of their jurisdic-

tion in favor of such aliens during the existence of hostile relations with the sovereign whose allegiance had not been renounced. And as already observed, we should not ascribe to Congress an intention, by indirection, to fix a different period or date at which the limitation upon the court may be effective.

It is needless to add that the interpretation of the statute cannot be made to depend upon considerations of equity or hardship respecting individual applicants; but the particular applications may be ordered to stand and await remedial legislation, if Congress shall see fit to pass it, or the pursuit of another course, if appellate judicial authority shall give the statute a different interpretation.