UNITED STATES v. KAMM. SAME v. GRAHL. SAME v. THOMAS.

(District Court, E. D. Wisconsin. January 3, 1918.)

1. ALIENS ⟜61—NATURALIZATION—ENEMY ALIENS.

In view of Rev. St. § 4067 (Act July 6, 1798, c. 66, 1 Stat. 577 [Comp. St. 1916, § 7615]), providing that, whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated or attempted by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being males of the age of 14 years and upwards, who shall be within the United States and not actually naturalized, shall be liable to be restrained, secured, and removed as alien enemies, a subject of the Imperial German Government who, shortly prior to the declaration of a state of war between the United States and that government, filed his petition for naturalization, is not, where the petition, because of the requirement for 90 days' notice, was not called for hearing and determination until after the war declaration, entitled to naturalization, for Rev. St. § 2171, enacted July 30, 1813 (3 Stat. 53, c. 36), declares that no alien, who is a native citizen or subject or denizen of any country, state, or sovereignty with which the United States shall be at war at the time of his application, shall be then admitted to become a citizen, and the fact that no petition prior to application for naturalization was required until Act June 29, 1906, c. 3592, 34 Stat. 596, does not show any intention on the part of Congress that enemy aliens, who may have, prior to the declaration of a state of war, filed a petition for naturalization, shall be treated as quasi citizens, who may be granted a certificate of naturalization after declaration of hostilities.

2. ALIENS ⟜71½ New, vol. 7 Key-No. Series—NATURALIZATION—PROCEEDINGS TO CANCEL CERTIFICATE.

Under Naturalization Act, § 15 (Comp. St. 1916, § 4374), declaring that it shall be the duty of the United States district attorneys for the re-

⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

spective districts, upon affidavit showing good cause therefor, to institute proceedings in any court having jurisdiction to naturalize aliens in the judicial district in which the naturalized alien may reside at the time of bringing the suit, for the purpose of setting aside and cancelling the certificate of citizenship on the ground of fraud, or on the ground that such certificate of citizenship was illegally procured, the federal District Court has jurisdiction of a proceeding to cancel a certificate of naturalization issued by a state circuit court, on the ground that the state court was without authority under Rev. St. § 2171, to admit the alien to citizenship, because he was an enemy alien and a state of war, before hearing on the petition, had been declared between the United States and the government of which he was a subject.

Petitions by the United States against Hans Kamm, Tador Grahl, and Frank Thomas to annul and vacate certificates of naturalization issued to the several defendants, which proceedings were consolidated. Certificates annulled and canceled.

H. A. Sawyer, U. S. Atty., of Milwaukee, Wis.

John F. Kluwin, of Oshkosh, Wis., W. W. Hughes, of Fond du Lac, Wis., and C. E. Armin, of Waukesha, Wis., for defendants.

GEIGER, District Judge. These three cases were argued at the same time, and by formal, though not written, stipulation of counsel in open court, are to be decided as involving uncontroverted facts presenting identity of legal questions.

The defendants, on and prior to April 6, 1917, were subjects of the Imperial German government. They resided in different judicial circuits of the state of Wisconsin, and prior to the date mentioned each had filed in the circuit court of the county of his residence a petition seeking naturalization as a citizen of the United States. The good character, the antecedent period of residence or domicile, and all other qualifications for citizenship under the laws of the United States, except as next herein noted, is conceded to each defendant. The petitions for naturalization were called for hearing and determination by the respective circuit courts after they had been pending the requisite 90 days, but after the date of the declaration of hostilities passed by Congress on April 6, 1917; and in each case the representative of the United States Naturalization Bureau appeared at the time and place of hearing, and objected to the reception of proofs or the determination thereof, solely on the ground that naturalization was barred by the provisions of section 2171 of the Statutes of the United States. The objection and protest was, in each matter, overruled, and certificates of naturalization were granted.

In due time the government filed in this court the petitions or complaints in these several cases, seeking to annul and vacate such certificates of naturalization; and the question is whether, upon the facts thus disclosed, the government is entitled to that relief.

Section 15 of the Naturalization Act reads:

"Sec. 15. That it shall be the duty of the United States district attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any court having jurisdiction to naturalize aliens in the judicial district in which the naturalized citizen may reside at the time of bringing the suit, for the purpose of setting aside and canceling the cer-

tificate of citizenship on the ground of fraud or on the ground that such certificate of citizenship was illegally procured. * * *" (Balance of paragraph provides for notice in proceedings based upon section.)

The parties have agreed that the cases be disposed of regardless of the manner in which the ultimate questions might be raised upon pleadings or proofs—that is to say, the facts being admitted, the cases are before the court as upon an agreed statement, permitting all questions of law, whether pertaining to jurisdiction or to the merits, to be raised.

[1] The questions in the cases are:

What is the proper interpretation of section 2171, which reads as follows:

"Sec. 2171. No alien who is a native citizen or subject, or a denizen of any country, state, or sovereignty with which the United States are at war, at the time of his application, shall be then admitted to become a citizen of the United States; but persons resident within the United States, or the territories thereof, on the 18th day of June, in the year 1812, who had, before that time, made a declaration according to law of their intention to become citizens of the United States, or who were on that day entitled to become citizens without making such declaration, may be admitted to become citizens thereof, notwithstanding they were alien enemies at the time and in the manner prescribed by the laws heretofore passed on that subject; nor shall anything herein contained be taken or construed to interfere with or prevent the apprehension and removal, agreeably to law, of any alien enemy at any time previous to the actual naturalization of such alien."

The question upon this section has arisen in both federal and state courts since the beginning of the present hostilities between the United States and Germany. It was under consideration by this court and the views entertained are found in the memorandum opinion published in 242 Fed. 971. The conclusion there expressed is adhered to, and any further expression to support what is there said is prompted by the wording of section 15 above quoted. That section gives the United States a right of action to annul certificates which have been "illegally procured"; and this presents the second question raised and ably argued in the present proceedings, viz. whether, if this court has properly interpreted section 2171, the certificates issued to the herein defendants, have been "illegally procured."

It was suggested (242 Fed. 971) that the language of the section should in any event receive an interpretation conforming in the highest degree with the policy plainly enunciated; that the proviso passed in 1813 to reach a situation growing out of the War of 1812, supported the view that it was intended to place an absolute prohibition upon the power of any court to naturalize subjects of an enemy country at the time when the United States are at war with that country; that the phraseology of the section, "at the time of his application," was adopted as naturally consequent upon the then routine of procedure; and it may now be noted that the last clause of the proviso indicates the congressional view that prior to "actual naturalization" no foreign subject acquired any status other than that of an alien, or an enemy alien, if a subject of a country with whom we are at war. That this was the then dominant view is further illustrated in section 4067 of the Revised Statutes of the United States (passed in 1798), defining the executive power over alien enemy subjects resident in this country. It is declared

to be all-embracing over subjects of the enemy domiciled here, and "not actually naturalized." That the executive of the United States conceives this statute to be the present definition of powers is evidenced by exercise of such powers from day to day ever since April 9, 1917, when the proclamation dealing with enemy subjects during the present war was promulgated.

It was therefore suggested that the executive was left just as free to exercise the powers of removal, internment, and exaction of security of or from those who had filed a petition for naturalization as from those who had not; and, if this be true, we can appreciate the consequences ensuing an interpretation of section 2171, upon which courts may naturalize those who had been so fortunate as to file their petitions before the outbreak of hostilities. That is to say, supposing, after the outbreak of hostilities, while petitions were pending, but prior to hearing, the executive, in the exercise of undoubted power, had taken steps permitted by section 4067, had either interned or exacted bail, or was about to remove from the country aliens, subjects of the enemy country, could the court, by proceeding with the naturalization of the petitioners and conferring citizenship, frustrate the executive will? I do not believe that any one would give to this question an affirmative answer. These considerations are proper in estimating the policy with which Congress was dealing and testify to an apparently clear conception that nothing short of actual naturalization changes either the alien, or the alien enemy status. They support the suggestion that, when the sovereign is seeking to ascertain (during the existence of war or at any time) the legal status or relation of legal allegiance of an individual, there is—between citizenship and alienage—no such intermediate thing as a quasi citizenship, quasi alienage, or a quasi enemy alienage. The individual alien enemy, because of his actual friendliness and loyalty to the sovereign of his domicile, may be dealt with, by the executive, upon considerations leaving him practically in as favorable a situation as a citizen; but in legal contemplation, and in respect of exacting consideration upon the basis of legal right, he is in no better position to insist upon it at the hands of the courts than is a less friendly or an actually hostile individual enemy subject.

Conceding, therefore, that when, in 1906, there was added, as a procedural requirement, the filing of a written petition, and thereby the meaning of "application," in section 2171, became equivocal or ambiguous, it is not sensible to ascribe to Congress an intention to classify alien enemy subjects into those who have and those who have not "petitioned" for naturalization at the commencement of war—a classification which, with equal reason, may be imposed upon section 4067, thereby limiting executive power over the former class. Both statutes proceed upon the view that the legally hostile status of the individual is the sufficient warrant for granting to the executive the one, and forbidding to the courts the exercise of the other, power, and the plain intent must have been that the power and the prohibition alike become effective, without reservation, at the instant such status attached to the individual. I am satisfied to adhere to the view (242 Fed. 971), that

these various considerations forbid interpreting section 2171 as amended in the particulars contended.

[2] This brings us to the second question, namely, whether certificates granted, as in the present cases, are "illegally procured" within the meaning of section 15 of the Naturalization Act. The question has been much discussed, and counsel have furnished to the court probably all of the adjudications bearing upon the subject. All seem to concede that it was entirely within the competency of Congress to confer upon any courts plenary powers to annul or cancel certificates tainted with fraud. But, on behalf of the defendants, it is stoutly insisted that it was not the intention of Congress—indeed, it is suggested that it was not within its competency—to endow courts of co-ordinate jurisdiction with the power to review each other's conclusions or judgments in matters of naturalization where the "illegality" of procurement in the initial court rested in plain diversity of judicial opinion as to the meaning of any provision of the Naturalization Law. To state it in the concrete terms of the present cases: The right of the present defendants to be naturalized depends upon the interpretation to be given to section 2171 respecting its inclusion or exclusion of those alien enemy subjects who had filed their petition prior to the outbreak of hostilities. It is said that whether it is one or the other depends upon the judicial view; both cannot be right. The wrong view, however, can result only through the exercise of power which the judicial mind expressing it may exercise. In other words, it is at most "judicial error." Therefore it is asserted that Congress never intended to create a situation fraught with such possibilities for confusion, not only confusion in the administration of the law, but the great possibilities of ever-present latent infirmities in all judgments of naturalization which may be granted.

The citations disclose the diversity of view that has arisen among judges, since the passage of the Naturalization Act of 1906, respecting the scope and true application of this section. No attempt has been made to examine the adjudications of state courts, but, on behalf of the defendants, are cited United States v. Meyer (D. C.) 170 Fed. 983; United States v. Luria (D. C.) 184 Fed. 643; United States v. Lenore (D. C.) 207 Fed. 865; United States v. Butikofer (D. C.) 228 Fed. 918; United States v. Ness (D. C.) 217 Fed. 169; United States v. Andersen (D. C.) 169 Fed. 201; United States v. Mulvey, 232 Fed. 513, 146 C. C. A. 471 (dissenting opinion, Hough, Judge); whereas the government cites United States v. Schurr (D. C.) 163 Fed. 648; United States v. Wayer (D. C.) 163 Fed. 650; United States v. Van Der Molen (D. C.) 163 Fed. 650; United States v. Nisbet (D. C.) 168 Fed. 1005; United States v. Simon (C. C.) 170 Fed. 680; United States v. Meyer (D. C.) 170 Fed. 983; United States v. Aakervik (D. C.) 180 Fed. 137; United States v. Johnson (C. C.) 181 Fed. 429; United States v. Plaistow (D. C.) 189 Fed. 1006; United States v. Nopoulos (D. C.) 225 Fed. 656; United States v. Mulvey, 232 Fed. 513, 146 C. C. A. 471; United States v. Nechman (D. C.) 183 Fed. 788. It is unnecessary that exhaustive review of these various cases be attempted. United States v. Lenore (D. C.) 207 Fed. 868, because of its ex-

haustive and vigorous discussion, is the leading citation in support of the proposition advanced by the present defendants. Judge Amidon, in referring to the causes which led to the passage of the act, found ample justification for a restricted interpretation of the term "illegally procured"—his general conclusion being that:

"Neither the debates in Congress nor the report of the investigation which was made before Congress contained any suggestion that any other evils were intended to be dealt with, or that the phrase 'illegally procured' was intended to set one court to annulling the judgments of another court of co-ordinate jurisdiction because of a difference of opinion in regard to a matter of law."

He adds:

"Two serious consequences must result from the exercise of this jurisdiction: First, it will produce a babel of conflicting judgments among courts of co-ordinate jurisdiction, and tend directly to destroy respect for the courts, and also to destroy that good will which should always exist among courts of co-ordinate jurisdiction. Second, it will tend to break down that comity which has [always] been the bond of peace between federal and state courts exercising co-ordinate jurisdiction in the same territory. Results so unfortunate can be justified only by imperative and unequivocal language."

Speaking directly to the definition of the term "illegally procured," he says:

"To say that a certificate which is issued pursuant to a full hearing in court is 'illegally procured,' if any error occurs in the proceeding, would be a wide departure from the language which courts have been accustomed to use in referring to judicial error. 'Illegally procured' imports, not an error of court, but willful misconduct on the part of the holder of the certificate or those who have acted in his behalf. The history of the statute shows that its language can be given full effect according to the mischief that was present to the thought of Congress, without opposing the whole judicial system that has hitherto obtained among courts of co-ordinate jurisdiction. I am therefore unable to follow the decisions in United States v. Mayer [D. C.] 170 Fed. 983, United States v. Plaistow [D. C.] 189 Fed. 1007, and the United States v. Schurr [D. C.] 163 Fed. 648. I concur in the view expressed in United States v. Luria [D. C.] 184 Fed. 643, 646, that ' "illegally procured" does not mean that the certificate was issued through error of law.' Errors of courts, committed in the honest exercise of their jurisdiction under the Naturalization Laws, must be corrected the same as in other cases by appeal or writ of error."

Without quoting further from decisions upon either side of the proposition, it suffices to say that in practically all there was a recognition by the courts of the precise question presented here; that some accepted the views above quoted and urged by the defendants; in others, the opposing view was adopted as the only method of accomplishing a purpose as broad as the language of the section can possibly afford. The contrariety of view, though widespread, nevertheless was concerned, except in one or two cases, with the particular point of difference found in the present cases. It is interesting to note that, as a result, an effort has been made to state the contending views with a suggestion respecting where the weight of authority rests. Thus, in 2 Corpus Juris, 1039, the author says:

"While there is some difference of opinion as to the meaning of the term 'illegally procured,' the better rule seems to be that it imports a certificate issued without authority of law, and, in effect, false and spurious; not an

error of law, but subornation or some other legal means to impose on the court. When a certificate is issued as a result of the judicial hearing in a good-faith attempt to exercise the jurisdiction conferred by the act of Congress, it is not open to attack in another court of co-ordinate jurisdiction simply by reason of alleged errors which may have occurred in the court pursuant to whose judgment the certificate was issued. Errors of that kind can be reached only by appeal or writ of error."

A reading of the cases gives the impression that an effort to define the terms "illegally procured" has at times resulted in their conversion into words either of identical meaning or scope, or such as themselves necessitate or are susceptible of, further interpretation or definition. For example, to say that a certificate is "illegally procured,"· when it is issued without "authority of law," or when it is in effect "false" or "spurious," is not very helpful in the very cases before us. If section 2171 be construed one way, it can surely be said that there is no authority in law for admitting the alien enemy subjects; whereas, a different view of the section leads to the opposite result. The question whether there has been continuous residence may upon one view of the facts bring the applicant within, and another view leave him without, the authority of the law to have his application granted; and, as hereinafter shown, whether an application was heard in "open" court may, upon the facts, lead to a diversity of views.

Obviously, the term "illegally procured" was used to comprehend something in addition to fraud; and the difficulties which attend a restricted interpretation have been referred to as a preliminary to a consideration of two cases decided by the United States Supreme Court, dealing with the scope of section 15, to the end of answering the question whether the proposition urged by the defendants here, in view of the result in those two cases, can be considered any longer open to debate. These cases are Johannessen v. United States, 225 U. S. 227, 32 Sup. Ct. 613, 56 L. Ed. 1066, and United States v. Ginsberg, 243 U. S. 472, 37 Sup. Ct. 422, 61 L. Ed. 853. The Johannessen Case is noteworthy in dealing with section 15, in so far as it authorizes suits to annul certificates granted on the ground of fraud, and, while recognizing the character of naturalization proceedings as judicial, leading to a judgment, self-evident of its own validity, it in like manner recognizes the power of Congress to authorize direct proceedings for their attack upon the ground of fraud and illegality; and, while the case leaves open for consideration the question respecting possibility of collateral attack in an independent suit, where it appears that upon the original hearing the precise matters were litigated upon full appearance and representation as in ordinary lawsuits, the importance of the case rests in its pronouncement that naturalization proceedings are in a class by themselves—are ex parte and not adversary in their initiation and contemplation. The court evidently did not consider—doubtless because of the contrary view long entertained, whether, if, as asserted by some courts, the proceedings are not judicial, but are delegated legislative or executive proceedings, jurisdiction for their conduct could, under the Constitution, be endowed upon the federal courts. It was held plainly that the manner or method for judicial review of the cer-

tificate of naturalization was wholly within legislative discretion within constitutional warrant. It is said:

"The act does not purport to deprive a litigant of the fruits of a successful controversy in the courts; for, as already shown, the proceedings for naturalization are not in any proper sense adversary proceedings, but are ex parte and conducted by the applicant for his own benefit. The act in effect provides for a new form of judicial review of a question that is in form, but not in substance concluded by the previous record, and under conditions affording to the party whose rights are brought into question full opportunity to be heard."

Counsel in the present cases seem to take the view that the Johannessen Case is entirely consistent with their contention, and it is interesting, therefore, to approach a consideration of the Ginsberg Case. There a federal court entertained a proceeding to cancel a certificate of naturalization issued by a state court, upon the ground, among others, that it had ignored the provision of the Naturalization Act for a hearing in open court, etc. The trial court seems to have held upon the facts that such provision was substantially complied with, and, when the case came to the Court of Appeals, the questions involved were certified to the Supreme Court, two of them, the first and fourth, being:

"Question 1: Is the final hearing of a petition for naturalization had in open court, as required by section 9 of the Act of June 29, 1906, chapter 3592, if after the petition is first presented in open court the hearing thereof is passed to and finally held in the chambers of the judge adjoining the court-room, on a day subsequent and at an earlier hour than that to which the court has been regularly adjourned?"

"Question 4: May certificate of citizenship be set aside and canceled in an independent suit brought under section 15 of the Act of June 29, 1906, chapter 3592, on the ground that it was illegally procured if the uncontradicted evidence at the hearing of the petition showed undisputably that the petitioner was not qualified by residence for citizenship, and that the court or judge, who heard the petition and ordered the certificate, misapplied the law and the facts?"

When we consider that these questions, not only in form, but in substance, were quite like many of the questions presented to the District and Circuit Courts of Appeal in the various cases which are above cited, and find that in some instances the judges had stated, not only the facts, but also the legal question thereby presented, in almost the identical language of these two certified questions—see, for example, the Nisbet Case (D. C.) 168 Fed. 1007, where the trial judge expresses his hesitation "before assuming authority to declare an act of a court of co-ordinate jurisdiction to be illegal for misinterpretation and misapplication of the law"—there can be no suggestion that the Circuit Court of Appeals, in certifying the questions, or that the Supreme Court in its consideration of the case, had any misapprehension of the precise conflict which had arisen among the various judges and courts, or that it was possible to treat the certified questions as calling for other than a direct response to meet that conflict.

The first question was answered in the negative; the fourth, in the affirmative; and the case supports the government's contention that, under section 15, the jurisdiction to cancel and annul certificates as "illegally procured" may be invoked whenever it is alleged, as matter of fact, that upon the granting of a certificate a court failed

to observe express directions or prohibitions, contained in the Naturalization Act, having a substantive bearing upon the qualifications or the right of the applicant, and which, had the court observed them, called for a denial of the certificate. It may be added that a more recent decision, United States v. Ness, 245 U. S. 319, 38 Sup. Ct. 118, 62 L. Ed. —— (decided December 10, 1917), not only reaffirms this, but, when read in the light of the District and appellate court opinions (United States v. Ness, 230 Fed. 950, 145 C. C. A. 144, Ann. Cas. 1917C, 41; Id. [D. C.] 217 Fed. 169), forecloses possibility of giving to the words "illegally procured" a restricted meaning.

So, in the present cases, jurisdiction being established, the court, in exercising it, is bound to apply its views upon the matters of fact and of law presented as the basis for the relief prayed; and as section 2171 is construed to embody an express prohibition against naturalization of individuals circumstanced, as were the defendants, a judgment annulling and canceling the certificate in each case must be granted.