## In re NATURALIZATION OF ALIENS WHO CLAIMED EXEMPTION FROM THE DRAFT OR FROM MILITARY SERVICE.

(District Court, E. D. Wisconsin. September 26, 1924.)

Aliens ⬅62—Affirmative answer to question as to claim of exemption in questionnaire under Selective Service Act held not to disqualify aliens from citizenship.

Declarant and nondeclarant enemy aliens and declarant and nondeclarant resident nonenemy aliens were not disqualified from citizenship by affirmative answer to question as to claim of exemption in questionnaire under Selective Service Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 2044a–2044g, 2044h–2044k), since alien enemies and nondeclarant nonenemy aliens were excluded from service by such act, and declarant nonenemy was not entitled to exemption, notwithstanding such question in questionnaire.

In the matter of petitions for naturalization of aliens who claimed exemption from the draft or from military service. Government's objection overruled.

Fred J. Schlotfeldt, Dist. Director of Naturalization, of Chicago, Ill., for the United States.

Nathan Glicksman, of Milwaukee, Wis., on invitation of court, and F. H. Gugel, of Milwaukee, Wis., for certain petitioners.

GEIGER, District Judge. These are applications for naturalization presented by aliens who, except for the objection urged as hereinafter noted, are conceded to be qualified for citizenship. The government, through the naturalization examiners, has objected in each case to the admission of the alien on the ground that, as a registrant and in filling out his questionnaire under the Draft Law, each of the applicants claimed exemption from military service on the ground of noncitizenship; that is to say, each such alien, in answering questions propounded to him respecting such claim of exemption, did put forward an affirmative claim, responsive categorically to the query.

The applicants fall into three broad classes: (1) Enemy aliens, declarant and nondeclarant. (2) Resident aliens (not enemy) declarant. (3) Resident aliens (not enemy) nondeclarant. The cases necessitate examination in some detail of the provisions of the Selective Service Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 2044a–2044g, 2044h–2044k), the rules and regulations promulgated by the executive pursuant to its authority, the form and contents of the questionnaire, and the practice of the various executive boards charged with the responsibility of administering the law.

Of course, with the limited exception therein prescribed, every male person with-

in the prescribed ages was required to register under the Selective Service Act. But the act contained certain clearly defined exemptions to liability for draft, and granted authority to the executive to exempt certain others. The broad provision of the act is: "Such draft as herein provided shall be based upon liability to military service of all male citizens, or male persons not alien enemies who have declared their intention to become citizens, between the ages of twenty-one and thirty years, both inclusive." Section 2 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 2044b).

The Vice President of the United States, the officers, legislative, executive, and judicial of the United States and of the several states, territories, and the District of Columbia, regular or duly ordained ministers of religion, divinity students, and persons in the military and naval service are declared "to be exempt from the selective draft herein prescribed." A further provision is found construing the act not to "require or compel any person to serve in any of the forces herein provided for, who is found to be a member of any well recognized religious sect * * * whose existing creed or principles forbid its members to participate in war in any form and whose religious convictions are against war or participation therein * * * but no person so exempted shall be exempted from service in any capacity that the President shall declare to be noncombatant."

The President is further authorized to exclude or discharge from said Selective Service Act and from the draft under the second paragraph hereof, or to draft for partial military service only, certain other persons, viz. county and municipal officers, Custom House clerks, postal employees, employees in the United States arsenals, navy yards, etc., and other persons "employed in the service of the United States," pilots, mariners in actual service, persons engaged in industries, including agriculture, found to be necessary to the maintenance of the military establishment, etc., those having dependents, those found to be physically or morally deficient. Section 14 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 2044d).

Coming directly to regulations prescribed by the Provost Marshal General's office for the enforcement and administration of the act, it is evident that, in view of the provisions above referred to, it became necessary to deal with registrants fundamentally under three classes: First, those who were admittedly, or upon examination, found to be absolutely liable for service; secondly, those who, upon examination or upon claims made by them, could be found to be and ordered excluded or exempt; third, those who, by the terms of the act, were required to be excluded or exempted. This is not the classification in form adopted, for, fundamentally, the division was "nondeferred" (hereinafter called "class 1") and "deferred."

The Provost Marshal's office by rule 70 declared that, while it was necessary that there be provided in every community a list of names of men who "shall be ready to be called into service at any time," the economic needs of the nation likewise required that "men whose removal would interfere with the civic, family, industrial, and agricultural institutions of the nation shall be taken in the order in which they best can be spared." For this reason, the rule continues, "the names of all registrants liable to selection shall be arranged in five classes, in the inverse order of their importance to the economic interests of the nation," etc.

The regulation further provided that "every registrant is to be considered as belonging in class 1 until his status *giving to him the right of deferred classification is clearly established under and in accordance with the principles and rules governing classification hereinafter stated.*" Further, "the term 'deferred class' includes the second, third, fourth, and fifth classes of the five classes in which registrants shall be placed. All registrants placed in classes 2, 3, 4, and 5 have been temporarily exempted or discharged. The effect of classification in class 1 is to render any man so classified presently liable to military service in the order determined by the drawings. The effect of classification in class 2 is to grant a temporary discharge from draft, effective until class 1 is exhausted, and similarly classes 3 and 4 become liable only when classes 1 and 2 are exhausted. All classifications are conditioned upon the continuing existence of the status of the registrant which is the basis of his classification."

Coming to the regulations prescribed by the President, and which were published soon after the enactment of the Selective Service Law, in May, 1917, they deal in some detail with the matter of exemptions and the procedure to be followed in their assertion and allowance. Such regulations follow quite closely the provisions of the act, hereinbefore referred to, which deal with absolute or conditional exclusion or exemption. For example, section 18 provides:

"The following persons or classes of persons, if called for service by a local board and not discharged as physically deficient, shall be exempted by such local board upon a claim for exemption being made and filed * * * and a certificate of absolute conditional or temporary exemption, as the case may require, shall be issued to any such person."

Then follows as a subdivision:

"e. *Subjects of Germany Residing in the United States.*—Any person who is a subject of Germany whether such person has or has not declared his intention to become a citizen of the United States.

"f. *All Other Resident Aliens Who have Not Taken out Their First Papers.*—Any person who is a resident alien; that is, a citizen or subject of any foreign state or nation other than Germany, who shall not have declared his intention to become a citizen of the United States."

The regulation further provides that:

"Any person who belongs to any of the classes above enumerated in this section shall be exempted upon the following conditions:

"e. *Subjects of Germany Residing in the United States.*—Any person who is a subject of Germany, whether such person has or has not declared his intention to become a citizen of the United States, upon presentation to such local board at any time within ten days after filing a claim of exemption by or in respect of such person, of an affidavit signed by such person setting forth the following information: Date and place of birth; date of immigration; whether he has taken out his first papers; other evidence."

The regulation proceeds:

"No subject of Germany residing in the United States, whether he has taken out his first papers or not, will be accepted for service. When in the opinion of a local board any person called for service is a subject of Germany, whether he has or has not declared his intention to become a citizen of the United States, or whether he or some other person in respect of him, has or has not filed a claim of exemption, he *shall* be exempted and a certificate of *complete exemption* issued to him.

"f. *All Other Resident Aliens Who have Not Taken out Their First Papers.*—Any person who is a resident alien—that is, a citizen of any foreign state or nation other than Germany—who shall not have declared his intention to become a citizen of the United States, upon presentation to such local board, at any time within ten days after the filing of a claim of exemption by or in respect of such person, of an affidavit signed by such person setting forth the following information: Date and place of birth; date of immigration; whether he has taken out his first papers; any other evidence as may be required in the opinion of the board to substantiate the claim."

It is of interest to note that in the administration of the law forms of *claims* and of affidavits for their support, and of certificates allowing exemptions, were prescribed by the Provost Marshal General, and therein, so far as the present cases are concerned, are found certain incongruities later to be noted, indicating that, administratively, distinctions indicated by the law were either ignored, as a result whereof claims for "exemption" nominally, at least, wholly without support or justification under the law, were recognized. Thus, coming to the form of questionnaire first used, and which, with the answers made by the applicants in the matters at bar, have given rise to these cases, the questions are arranged serially, but meet the situations of absolute or conditional possible exemptions above referred to. With respect to the matter now in hand, series 7 deals broadly with "citizenship." It is as follows:

## "Series VII, Citizenship.

"Instructions.—Every registrant must answer the first question. If he answers 'yes,' he need not answer the remaining questions or sign his name. If he answers 'no,' he must then answer the second question. If he answers the second question 'no,' then he need not answer the remaining questions, but must sign his name. If he answers the second question 'yes,' he must answer *all* the remaining questions and must sign his name.

"Q. 1. Are you a citizen of the United States? A.1. ———.

"If your answer is 'yes,' do not answer any other questions and do not sign your name.

"Q. 2. Do you claim exemption from military service because you are not a citizen? A.2. ———.

"Q. 3. Where and on what date were you born? A.3. ———.

* * * * * * * * * *

"Q. 7. Did you come to this country with your parents? A.7. ———.

"(State whether you came with both, and if not with both, which.)

"Q.8. Has either of your parents been naturalized in the United States? A.8. ————.

"Q.9. Have you ever voted or registered for voting anywhere in the United States; if so, where? A.9. ————.

"(If 'yes,' when and where?)

"Q.10. Have you ever taken out first papers; if so, when and where? A.10. ————.

"Q.11. Are you willing to return to your native country and enter its military service? A.11. ————.

"(To be 'yes' or 'no.')

"Note.—See Sec. 79, S. S. R."

On the first page of the questionnaire the various classifications—five in number—are tabulated, with instructions that the form be used "for claiming exemption or deferred classification, and that a cross "X" be placed in column A "opposite the division that states the ground of claim."

Thereupon class 5 is thus given:

"Class V.

"A—Officers, legislative, executive, or judicial, of the United States, or of state, territory, or District of Columbia.

"B—Regular or duly ordained ministers of religion.

"C—Student who on May 18, 1917, was preparing for ministry in recognized school.

"D—Persons in military or naval service of United States.

"E—Alien enemy.

"F—Resident alien (not an enemy) who claims exemption.

"G—Persons totally and permanently physically or mentally unfit for military service.

"H—Person morally unfit to be a soldier of the United States.

"I—Licensed pilot actually employed in the pursuit of his vocation."

The form, and, as will be seen, scope and subject-matter, of the questions required to be answered "yes" or "no," is such that a negative answer by an enemy alien, or by a nondeclarant nonenemy alien, or an affirmative answer by a declarant nonenemy alien, would in each case be futile; that under the terms of the law the first two could not be given other than "deferred classification," "exemption," or "discharge," whichever it be called, and the last could not and should not (upon that answer) be deferred or discharged. In other words, the question by its very inherence, so to speak, put forth noncitizenship as a basis for an assertable claim for exemption. It is not directed to ascertainment of a fact, which, being dis-closed, left him, by the very terms of the law within or without liability to draft. The determination of such liability depended, not upon any claim made by him, resting broadly upon his noncitizenship, but, under the law and regulations (limiting ourselves to their clear terms) upon the character of his noncitizenship, or, more accurately, the character of his alienage, and when that was determined by answers to questions pertinent to the precise categories established—and such questions were asked and answered—the administrators of the law had no discretion in placing him within or without the range of liability.

The law and the facts, thus ascertained, dictated the discharge of duty, and the wish or whim or desire of the draft boards or other administrators, or of the registrants, was and were not relevant. There was and is, under the law and regulations, no such thing as a claim of exemption on the ground of noncitizenship; there was such a thing as exclusion, peremptory, on the ground of certain kinds of alienage—i. e., enemy, both declarant and nondeclarant, and nonenemy nondeclarant.

We are confronted, therefore, with determining why a question of the substantive breadth above indicated was ever asked for the mere purpose of eliciting the attitude of the registrant in respect of a claim? Why were aliens, who, under the law, were subject to nothing but peremptory exclusion, asked whether they claimed exemption, when, under the law, a negative answer still left them nothing but exclusion? Why an alien nonenemy declarant asked whether he claimed exemption, when, if he claimed it, he was included within the range of liability? In answering these queries, no matter how, we recur ultimately to the question basically involved in these proceedings, viz. what effect, as a matter of evidence, must be given to such answer—if the answer makes a nontenable claim—in these naturalization proceedings, arising years after the questionnaire, and, obviously, proceedings never conceived to bear any relationship to proceedings under the Selective Service Act?

As indicated, the position of the government is that the making of these so-called claims is evidence conclusive in bar of the right to naturalization. When attention is called to the precise terms of the law and regulations, and necessarily the limited functions of their administrators, no answer has been given to the questions thus propounded, except that it was within the province of the administrators of the Draft Law

to elicit the attitude of aliens, to the end of aiding the military establishment in passing upon personal fitness to become a soldier. But the law forbade lodging a discretion of that character, because considerations settled by the law itself pointed the clear limitations of administrative authority. The law did not say that the draft boards should ascertain whether enemy aliens were willing to go to war, or whether declarant nonenemy aliens should, in the like discretion of the draft boards, be allowed to indicate whether they desired to stay out. It gave the various administrative bodies created under the regulations—indeed, the regulations themselves gave such administrative boards —no larger discretion with respect to aliens than it did with respect to citizens. The law and the regulations did not comprehend, except as therein clearly expressed, ascertainment of personal wishes or whims of either citizens, or noncitizens, in respect of compulsory service.

Therefore, in view of the form of the question which is fundamentally involved in these proceedings, and which, as above indicated, is mistakenly too comprehensive, and, as was soon thereafter recognized, was mistakenly acted upon, must it now be said that registrants, conceiving the question by its very inherence to recognize a right, be bound by the answers thereto as evidence conclusive upon issues in a naturalization proceeding? Must it be said that the alien should suffer through the mistake thus made, and should likewise suffer through the error made by the administrative board in bound by the answers thereto as evidence conclusive upon issues in a naturalization proceeding? Must it be said that the alien should suffer through the mistake thus made, and should likewise suffer through the error made by the administrative board in giving him deferred classification, when he was not entitled to it, though the duty of the board to refuse it to him is asserted to be perfectly clear? Should such consequences be visited upon alien registrants, who had not the slightest reason to apprehend that, as is now insisted, they were in fact being catechized with respect to their meeting probational requirements of the naturalization law? Or, as before queried, shall we conclude that the administrative boards, also advisory boards, consisting largely of members of the legal profession, deliberately committed themselves to exacting futile answers respecting untenable claims—either for or against willingness to serve—with the idea that such answers

might serve to block naturalization? And all this not only without even advising registrants of the futility of their answers, but actually following it with a disregard of the law by giving deferred classification or discharge?

Is it to be said, knowing, as should have been known, that enemy aliens could not be accepted (see law and regulations), the administrators of the law still rightfully contemplated and exercised authority to ask such enemy aliens whether they claimed what under the law they could not escape— exclusion—all with the design that thereby such registrants became barred (forever, as one judge held) from asserting and proving "to the satisfaction of" a court that, within the period prescribed by the Naturalization Law, he "has behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same"?

Confining our observations to such of the cases as deal with enemy alien registrants, the question is again asked: What effect should be given in these proceedings to answer in their questionnaires that they claimed exemption, etc.? It is well to start with a recognition of the status of an "enemy alien." The words themselves give the whole characterization. Every statute dealing with the subject recognizes the status as one in which the hostility of the enemy sovereign is ascribed to the enemy subjects wherever they may be. That is why naturalization of enemy aliens during war is forbidden, and why they are within summary control of executive authority. In re Naturalization, etc. (D. C.) 242 Fed. 971; U. S. v. Kamm (D. C.) 247 Fed. 968. In the light of these fundamentals, so clearly and emphatically recognized in the Draft Law and regulations, it seems idle to contend that the administrative and advisory boards were charged, or were permitted to charge themselves, with the function of inquiring into the actual personal attitude of those who (1) could in no event be accepted for military service; (2) could in no event be naturalized; (3) could, in respect of their personal freedom, accept only what executive grace saw fit to grant them.

Recurring for a moment to the questionnaire, the classifications, and—apparently— the manner in which registrants were dealt with, it is significant, as the court interprets the situation disclosed by the Government, that the administrators of the draft themselves lost sight of the very distinction which

was made by the law respecting any enemy and nondeclarant aliens on the one hand and declarant nonenemy aliens on the other. Thus, "class 5," in dealing with this subject, recognized but two, viz.: "E—alien enemy," and "F—resident alien (not an enemy) who claims exemption." Whether or not this was an error, the fact remains that throughout the first and second draft it was the classification used to reflect the result or "posting" of the answers in the questionnaires. That it was recognized and deliberately acted upon would seem to be borne out by the schedules prepared by the Judge Advocate General's office, which show the enormous number of resident aliens, nonenemy declarants, *who were in fact given deferred classification.*

I am not now considering the question whether it was, or was not, wrong for a nonenemy declarant alien to claim exemption. I am not discussing the question whether the duty of military service should, or should not, be imposed upon any or all resident aliens. The important question here is whether, in point of fact, there was a situation which demands that the making of these claims as they were in fact made *and recognized,* standing alone and as a mere matter of evidence, is sufficient to bar the alien from substantiating a petition for naturalization. Although the Selective Service Law, in imposing obligation for military service, "followed the tradition of the Civil War" (second report of the Provost Marshal General, 1919), "it led in two ways to negotiations with foreign governments":

"(1) In the first place, foreign treaty countries—i. e., those having treaties providing for exemption from military service—claimed that these treaties remained in force, and that the act violated the treaties. Naturally, this claim was made by neutral countries mainly. Almost at the very beginning, the neutral nations' diplomatic representatives approached the State Department with numerous requests to relieve their nationals from the operation of the law, and many protests were filed against the induction of individual aliens into the military service, as being in violation of international law and treaty obligations. Frequently no distinction was made, in these requests of the diplomatic representatives, between declarants and nondeclarants. Desirous as this government was to find a solution which should relieve the difficulty thus created, it was realized that the President, as chief executive, had no authority to go counter to the express terms of the law by declaring

the nationals either of friendly or of neutral countries to be exempt from liability under the Selective Service Law. But the extent of his authority as commander in chief of the armed forces in respect to such nationals after they had been inducted into the service was a distinct matter. The discussion was finally closed by the President, as commander in chief of the army and navy, promulgating his order of April 11, 1918, wherein he directed, in respect to aliens drafted into the military service of the United States, that—

" 'I. Both declarants and nondeclarants of treaty countries shall in all cases be promptly discharged upon request of the accredited diplomatic representatives of the countries of which they are citizens.

" 'II. Nondeclarants of nontreaty countries shall be promptly discharged upon the request of the Secretary of State, and also when the War Department is satisfied that a discharge should be granted in cases where a full and fair hearing has not been given by the local board.'

"The first paragraph of this order, in its application to declarants, was directed to relieve the situation caused by the conflict between the Selective Service Act and the treaties. The second paragraph, as well as the nondeclarant portion of the first paragraph, was directed to relieve the situation already described as to nondeclarants.

"As to declarants, relief was finally given by Congress to neutrals (but without distinction as to treaty countries or nontreaty countries) by the act approved July 9, 1918, which provided that any citizen or subject of any neutral country, who has declared his intention to become a citizen, shall be relieved from liability to military service upon his making a declaration withdrawing such intention, which shall operate and be held to cancel his declaration, and he shall then forever be debarred from becoming a citizen of the United States. This provision was construed, so far as the selective service machinery was concerned, to apply only to declarant neutral aliens who had *not* already been inducted into the service. But for those already inducted it was given practical effect by War Department General Orders No. 92, October 16, 1918, which authorized commanding officers to discharge such neutral declarant aliens upon application.

"(2) The foregoing measures of relief applied virtually (though not literally) to neutral countries. For cobelligerent countries the solution was reached by reciprocal

treaties of conscription. The negotiations for these treaties had their inception in the situation already described in regard to the problem of including nondeclarant aliens in computing the quota basis. But, as the negotiations progressed, the proposed measure was found to contribute also to the solution of these other problems concerning the liability of declarant aliens of cobelligerent nationality. So as early as July 19, 1917, the British embassy suggested to the Department of State the conclusion of a convention respecting the military service of the nationals of Great Britain and of the United States residing in the United States and Great Britain, respectively, this convention to authorize the reciprocal drafting of such nationals both declarant and nondeclarant. On August 29, 1917, the Secretary of State submitted to the Secretary of War the draft of a convention which it was proposed to conclude with all the allied nations, and on September 17, 1917, the Secretary of State submitted to the British, French, Italian, and Greek embassies the draft of a convention for consideration by their respective governments, having for its purpose the reciprocal drafting of the nationals of each country. The proposed conventions provided that alien residents should be allowed an opportunity to enlist in the forces of their own governments, and that, failing to do so within a prescribed time, they should become subject to the selective draft regulations of the country in which they were residing. It was agreed that the convention with Great Britain should be finally concluded before those proposed to our other cobelligerents were proceeded with."

This extended excerpt is taken from the report of the Provost Marshal General referred to, with the belief that it accurately narrates the situation developing in the enforcement of conscriptive legislation against alienage, and its significance rests in this: That, although the Draft Law recognized unreservedly the exclusion of enemy and nondeclarant aliens, its efficacy—from the standpoint of international rights and obligations—as against declarant aliens (of both cobelligerent and neutral nations) was at once challenged. Here, again, it is not needful for the purposes of this case that we discuss the question of merit involved in the challenge. It suffices that, notwithstanding the plain import of the provisions of the Draft Law as against declarant aliens, its tenability—in its international aspect—was recognized to be open to debate.

Not only was it so recognized, but the degree of debatability is fully manifested by the steps taken as disclosed in the foregoing narrative.

Now, in that situation, and bearing in mind what has been noted, that the administrators of the Draft Law—upon some promptings—granted deferment to many in each class of aliens, the query at once arises: Was this done (1) erroneously or indiscriminately, without having in mind the otherwise clear provisions of the law; (2) with the idea that a claim of exemption was tenable and properly interposed; or (3) did the administrators of the Draft Law, conscious of the untenability and impropriety of the so-called "claim" (as to declarants), deliberately abdicate their plain duty, and, without right, yield?

In the consideration of these cases, no one should have the hardihood to accept the third hypothesis, and therefore we are concerned with the probative effect to be given to the claim and recognition of exemption upon either of the other two hypotheses. The vast number of instances in which such deferment ensued hardly justifies the conclusion that they all resulted through carelessness, though, as above indicated, the classification found in the forms unquestionably lost sight of the distinction attempted to be made by the law between declarant and nondeclarent nonenemy aliens.

Now, if we cannot conclude that the administrators of the law, having a settled conviction that the so-called claims for exemption were wholly untenable, still recognized them; if we cannot conclude that recognition of the claims was the result of carelessness—then the course in fact pursued is without explanation, unless subsequent developments, as noted, demonstrate that the whole matter of pressing the Draft Law against an alien status was believed to be open to fair, if not grave, debate. Upon elementary grounds the distinction between citizenship and alienage persisted; and, regardless of what an individual alien may or might claim, the attempt to impose the highest obligations of citizenship upon domiciled aliens—even though they be declarants—who had not the *rights* of citizenship challenged attention because of its international aspect, and its alleged violation of immunities asserted by foreign powers, in some instances upon a treaty basis, and in others upon fundamentals of international relations.

Therefore, regardless of what an individual may conceive to be the obligation of a

declarant alien, his actual alien status and foreign allegiance, until full citizenship was accorded him, so our government seemed to recognize, was entitled to consideration, regardless of the terms of the legislative act. It is fair to infer that, when the government was challenged, the question was recognized as of a debatable character sufficient to deter pressing the controversy to a conclusion either for or against the precise terms of the legislation. The matter was composed, as it were, in the manner indicated.

So, without attempt to determine the question thus raised, the status of alienage was, in spite of the terms of the law as to declarants, recognized internationally as necessitating "negotiations." Should it now be said that, notwithstanding such recognition, both by this government and foreign governments, the subjects of the latter, domiciled here as declarants, could not, consistently with their probationary status under our naturalization laws, in good faith entertain the same belief as to immunity (under existing treaties or on fundamental principles of international law), and in like good faith upon their questionnaire, which, by implication, at least, conceded the right or immunity, could not answer affirmatively that they desired to enjoy it? Or, as hereinbefore stated, was the question rightfully asked and required to be answered, but, if in the affirmative, then at the peril (1) of being none the less inducted; and (2) of barring future naturalization?

In considering the cases upon the foregoing analysis, I have not lost sight of the conflict of opinion among judges upon this question. But, if the view suggested has any merit whatever, it must lead to rejecting considerations found in adjudicated cases which deal with the matter as one involving inquiry into a supposed "loyalty"—to be tested out by the obligations of completed citizenship. These rulings uniformly ignore the fundamental distinction between citizenship and alienage, which our own government seemed forced to recognize in the "negotiations" and in the executive acts and legislation subsequent to the questionnaire. So, too, no merit is conceived to reside in the mere generalities which characterize the disposition of some of the cases, among them the generality that citizenship is conferred as a matter of "grace."

True it is, when we recognize that there is no obligation upon one sovereign to naturalize subjects of another, the act of conferring rights of citizenship by naturalization may be said to emanate from "sovereign grace." But when the Congress of the United States, in exercising the constitutional power to "establish a uniform rule of naturalization," prescribed the terms and conditions in plain and apt language, and when it endowed courts with the administration of such law, thereby requiring them to function as in other situations where judicial power is exercised, it did not and could not have intended to vest in such tribunals a sort of undefined *judicial grace*, to be granted or withheld without restraint. It is not possible that granting or withholding naturalization can proceed upon considerations of mere personal views, regardless of evidence which may be offered pertinent to support or to defeat the right.

Therefore we recur to the fundamental question, whether these answers in response to queries, which by implication conceded the right to answer either affirmatively or negatively, must be accepted as alone probatively sufficient to deny the right of naturalization. I have no hesitation in answering in the negative as to enemy aliens, both declarant and nondeclarant, upon the grounds first, and as to nonenemy declarants and nondeclarants upon grounds secondly, herein discussed.

It has been interesting, in connection with the questions herein raised, to observe and consider the attitude of the government in its course toward those aliens with respect to whom the objection herein was sustained by some of the courts. Naturally, the query arose: When, if ever, could aliens so rejected have freed themselves from their self-imposed burden? Naturally, the government, in answering that an entirely new probationary period had to be established, was confronted at once in determining the time from which such period should run. At first it was suggested that the date of the Armistice, November, 1918, was the proper point of commencement. Again, that the date of the final treaty of peace was the proper point. I have no doubt that the government must realize the incongruity of its position. Plainly, if such is the law, it put aliens who really desired to avoid service to no severer task than making a choice between going to war and deferring their naturalization.

Manifestly, nothing has been said or intended in this opinion to preclude the government in any one of the cases from showing that a particular applicant was in other respects wanting in that feeling of attachment to the principles of the Constitution of the United States which would bar him,

regardless of his course upon the questionnaire. If, as was suggested upon the presentation of the cases, it is a fact that an alien had and manifested a feeling of hostility, or had in conduct otherwise negatived his good faith toward this government, *that*, regardless of his answer to the questionnaire, should be regarded as adequate to defeat his application for naturalization. But, as indicated, the claim for exemption alone is not sufficient to prove such or any analogous situation.

The number of cases presented to the court which involve the question raised by the government was such that the court was unwilling to assume the determination thereof without some aid. It was felt that many of the applicants for naturalization were in humble station of life, of insufficient means to employ counsel upon a contest, and some of them, perhaps, without adequate realization of the importance of the question and the ensuing consequences. Thereupon the court invited a distinguished member of the bar to consider the question projected by the government, not merely as counsel for the applicants, but impartially, with a view of aiding the court in reaching a conclusion. For his industry, and the great assistance in unselfishly devoting himself to the cases, the court desires to express its appreciation.

An order may be entered, in each of the cases, overruling the objection made by the government.